# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIM ACTION NO. 3:15-CR-00633 |
| v. | MEMORANDUM IN OPPOSITION TO GOVERNMENT'S MOTION FOR AN UPWARD VARIANCE |
| JOSEPH CARLTON MEEK | |

## I.     INTRODUCTION

On February 27, 2017 three days prior to the scheduled sentencing hearing and ten (10) months after Joseph Meek's guilty plea while the undersigned defense counsel was out of the State with an unavoidable conflict, the Government moved this Court to upwardly vary from the Sentencing Guidelines range as outlined in the Pre-Sentence Report. This motion for an upward variance, filed some ten (10) months after Joseph Meek's guilty plea, relies on facts known to the Government since at least September of 2015 when Joey Meek was first indicted and arrested and offers little explanation in terms of its timing or its rationale.

As this Court is aware, the Presentence Report was first prepared for this Court on April 19, 2016 – nearly one year ago and <u>prior</u> to Joseph Meek's (hereinafter "Joey") guilty plea. After extensive negotiations between the Government and defense counsel over the application and interpretation of the Sentencing Guidelines in this case, the Government confirmed its understanding of the Sentencing Guidelines in an email to defense counsel dated February 23,

1

2016. (*See* Attached **Exhibit A** – Email from AUSA Richardson). Attached to this email was a proposed Plea Agreement. The Plea Agreement contained cooperation provisions and provided that if Joey were fully compliant with his Plea Agreement and provided substantial assistance to the Government, the United States would move for a downward departure in his Sentencing Guidelines pursuant to Rule 5K1.1 or Rule 35. The United States made it clear in this email, the Plea Agreement, and in numerous oral communications that the United States would "permit him to begin cooperating in hopes that he can help himself." *See* **Exhibit A**. In other words, the Government expressly stated that Joey would be given the opportunity to earn a <u>downward</u> departure, as long as he complied with the terms of his Plea Agreement. Joey subsequently pled guilty on April 29, 2016 to both counts of the Indictment.

The Government's motion for an upward variance is an extreme departure from its previous position and is made without any explanation other than pointing to facts that the Government has known since Joey's arrest and well before entering into the Plea Agreement. This Court should not sanction such a tactic. A prosecutor "may prosecute with earnestness and vigor-- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78 (1935).

Further, the Government's motion has several fundamental flaws. First, it relies upon the fact that Joey failed to report to authorities Roof's statements about his desire to commit crimes in Charleston, South Carolina. The Government acknowledges, however, that Joey had no legal obligation to report any statements made by Roof and is not charged in <u>any</u> crime involving the time period prior to Roof's horrific crimes.

Second, the Government fails to distinguish that Joey is charged with conduct which

occurred <u>after</u> Roof's crimes were already committed. Joey is not charged, nor has the Government provided any evidence of his guilt of any crimes prior to Roof's crimes. The Government's recent and sudden insinuation that Meek's failure to act was somehow the direct cause of the crimes committed by Roof is disingenuous. This allegation ignores the Government's own failures in allowing Roof to buy and possess a handgun with a pending drug charge and fails to consider a number of other events and circumstances that perhaps could have also prevented this crime. Most importantly, the insinuation that Joey could have prevented this crime completely ignores the evidence adduced in Roof's trial which demonstrated that: 1. Roof was determined to commit these crimes; 2. Roof had been planning these events for more than six months (long before he and Joey reconnected in mid-May 2016); 3. Roof told no one he had decided to go through with his plan on the day of the shootings; and 4. Roof acted <u>completely</u> alone.

Finally, the extraordinary people who were killed on the evening of June 17, 2015 at AME Mother Emanuel Church, their families, and friends are victims of the horrific crimes committed by <u>Dylann Roof</u>. Joey Meek pled guilty to two non-violent offenses - lying to the FBI and concealment of facts – both of these events took place <u>after</u> Roof's crimes had already been committed. After an intensive, thorough, and complete investigation lasting almost two years and a federal death penalty trial, the Government has <u>never</u> alleged that Joey was in any way a participant or conspirator in Roof's crimes. In fact, during the Roof trial, it was crystal clear that Roof acted entirely alone. The Government has made it extraordinarily clear that this "was a lone act". (*See* **Exhibit B** – Free Times article) Accordingly, Joey should not be treated or sentenced as if he is guilty of Roof's horrific crimes.

## II.  FAILURE TO REPORT A PERSON'S PLAN OR DESIRE TO COMMITT A CRIME IS NOT  IS NOT ILLEGAL AND JOEY MEEK IS NOT CHARGED IN ANY SUCH CONDUCT.

The Government acknowledges in its' motion that Joey had no duty to disclose Roof's drunken rant about starting a race war and his desire to commit the crimes in Charleston—but then seeks to punish him for the same.  Indeed, there is no duty to report a crime or more importantly, the fact that someone has merely talked about committing a crime in South Carolina. In a discussion regarding the state offense of misprision of felony, the South Carolina Supreme Court made clear in *State v. Carson*, 274 S.C. 316, 262 S.E.2d 918 (1980), that a private citizen has no duty to come forward and report knowledge of a crime. The *Carson* Court further reiterated that "[u]nder the federal and state statutes embodying the offense, mere silence or failure to come forward is not enough to constitute misprision; there must be some positive act of concealment of the felony. *Id.* at 318 *citing United States v. Johnson,* 546 F.2d 1225 (5th Cir.1977); 21 Am. Jur. 2d *Criminal Law*, § 7. Accordingly, like the federal statute, the offense of misprision in South Carolina requires the additional act of concealment.

Despite knowing the federal and applicable state law, the Government infers that if Joey had disclosed these statements, law enforcement could have intervened and presumably the shootings would not have occurred. Not only is the Government's position greatly flawed, it is extremely unfair to place the blame for Roof's crimes on Joey - a young man who was not equipped to anticipate Roof's capabilities or acts. The Government is fully aware that Joey comes from an abusive past; has a ninth grade education; suffers from a lifetime of mental health issues; and has a prolonged history of substance abuse problems.

Joey's failure to appreciate the seriousness of Roof's statements is not unusual in today's shock value culture. Unfortunately, we live in a society where some people say shocking and violent things every day to each other while in person or on social media. A simple Google search reveals that people in our society threaten to kill others and commit violent acts every day on the Internet. Recently, following President Donald Trump's election and Inauguration, more than 12,000 tweets calling for his assassination came up on Twitter. *See* **Exhibit C** – News Articles). Indeed people routinely threaten to kill the President of the United States; they threaten to blow up the White House; they threaten to shoot members of Congress; and they threaten to harm all different kinds of people all of the time. This has become the norm. The following are merely a few examples:




**weird al yankmadik**
@drugcaat

 Follow

I have no pain in my heart or morality when I say if trump's elected I will perform an assassination attempt on him, and that i will succeed

LIKES
6


4:11 PM - 20 Feb 2016



The above is the sad reality we live in. Furthermore, for people like Joey who grew up in a house with domestic violence, alcohol and drug abuse, it is not at all unusual to hear people threaten to kill each other.[1]

### III.    JOEY MEEK'S CRIMES WERE COMMITTED <u>AFTER</u> ROOF'S HORRIFIC CRIMES AND HIS FAIILURE TO REPORT DID NOT DIRECTLY RESULT IN THE MURDERS .

Joey pled guilty to two non-violent offenses – misprision of felony and lying to the F.B.I. Both of these crimes were not committed until <u>after</u> Roof's crimes were already completed. An analysis of the elements of these crimes clearly demonstrates this fact.

To establish the crime of misprision of felony, the Government must prove: (i) a felony was committed; (ii) the defendant knew that the felony had been committed; (iii) the defendant failed to notify authorities; and (iv) the defendant took an affirmative step to conceal the crime. 18 U.S.C. § 4; *Neal v. United States,* 102 F.2d 643, 646 (8th Cir. 1939); *United States v. Baez,* 732 F.2d 780, 782 (10th Cir. 1984); *United States v. Ciambrone,* 750 F.2d 1416, 1417 (9th Cir. 1984); *United States v. Stuard,* 566 F.2d 1, 2 (6th Cir. 1977). Thus, after Roof committed these crimes and Joey realized it was Roof that had committed the crimes, his failure to notify authorities and his affirmative concealment of his knowledge was the commission of Joey's crime.

---

[1] Joey's treating psychiatrist will address this issue more fully at the sentencing hearing.

Likewise, to establish the crime of making a false statement in violation of 18 U.S.C. 1001, the Government must prove that (i.) the defendant made a statement; (ii.) the statement was false; (iii.) the statement was material; (iv.) the defendant acted knowingly and willfully; and (v.) the statement pertained to a matter within the jurisdiction of the executive branch of the United States government. *U.S. v. Oceanpro Industries, Ltd.*, 674 F.3d 323 (4th Cir. 2012). Thus, <u>after</u> Roof committed the murders in Charleston and Joey was interviewed by the F.B.I., his failure to failure to be fully truthful was the commission of Joey's crime.

In order to obtain the extraordinary remedy it now seeks, the Government's motion attempts to lay the full blame of Roof's crimes on Joey's failure to report Roof's statements. However, the Government's motion fails to consider the fact that the Government itself has acknowledged that it had the opportunity to prevent Roof's crimes from occurring and in the words of FBI Director James Comey made a "mistake". On July 10, 2015, James Comey, the Director of the F.B.I. fully acknowledged the FBI's mistake in allowing Roof to purchase a firearm when he clearly should have been a prohibited person under federal law. *See* **Exhibit D** – Statement by FBI Director James Comey Regarding Dylann Roof Gun Purchase.

Indeed, the facts regarding Roof's purchase of the firearm used are a matter of public record. On April 11, 2015, Roof went to Shooter's Choice, a South Carolina gun store, spoke to a clerk and filled out the required federal paperwork for a purchase. On April 16, 2015, after waiting for a background check, Roof returned to Shooter's Choice to purchase the .45 caliber handgun. Roof purchased the gun with cash which had been provided to him by his parents specifically for the purchase of a firearm. Because the F.B.I failed to issue a formal denial from

federal officials, the purchase was completed. Roof, however, had a pending drug charge on his record and should never have been. allowed to purchase the weapon.

The point here is not to blame others for Roof's crimes, but simply to point out that the Government's argument that Joey could have stopped Roof is hypocritical and disingenuous. The bottom line is that Roof is a seriously disturbed and hateful individual that no one could anticipate would commit such horrendous crimes against humanity. The correct and only person to blame for these violent, hateful, and senseless deaths is Dylann Roof.

### IV    THE VICTIMS OF THE AME EMANUEL CHURCH SHOOTING ARE THE VICTIMS OF DYLANN ROOF'S CRIMES

The extraordinary people killed on the evening of June 17, 2015 were killed by Dylann Roof and are the victims of his crimes. The Government has acknowledged this fact. The Presentence Report in this case makes no mention of any person victimized by Joey Meek. The Pre-Sentence Report has no information regarding the persons affected by the shooting at AME Emanuel Church. In fact, Paragraph 28 of the Pre-Sentence Report (which was written approximately a year ago) contains the following statement:

**<u>Victim Impact</u>**

28.    There are no identifiable victims in this offense.

Although the Government in its February 27, 2017 Motion for an Upward Variance appears to be taking the position that the victims in Dylann Roof's case are also the victims in Joey's case, this position is totally inconsistent with the Pre-Sentence Report which has been in existence for

almost a year. Not only did the Government fail to object to Paragraph 28 or the Offense Conduct, the Government expressly stated that it had no objections to the report.

## V. JOSEPH MEEK HAS BEEN FULLY COMPLIANT WITH HIS PLEA AGREEMENT AND THE TERMS OF HIS BOND

As noted previously prior to Joey's guilty plea, defense counsel and the United States negotiated the application and interpretation of the Sentencing Guidelines and the terms of Mr. Meek's Plea Agreement. (*See* Attached **Exhibit A** – Email from AUSA Richardson). The United States made it clear both in this email and in oral communications that the United States would "permit him to begin cooperating in hopes that he can help himself." *See* **Exhibit A**. In other words, the Plea Agreement provides and the Government expressly stated that Joey would be given the opportunity to earn a downward departure or a Rule 35, so long as he complied with the terms of his Plea Agreement.

At no time to date, has the Government *ever* notified defense counsel, the Probation Office, Roof's attorneys or this Court that Joey was in breach of his Plea Agreement. Further, at no time to date, has the Government or the Probation Office ever notified the undersigned defense counsel that Joey had failed to comply with the terms of his bond. Quite to the contrary, Mr. Meek has done everything asked of him by the Government during the entire time period after his guilty plea; during the Government's preparation for the Roof trial; during the actual trial of Dylann Roof; and at all times to date. Despite these facts, the Government has chosen to reverse course and move for an upward variance without any real explanation.

### A.       Joseph Meek's Debriefing by the Federal Bureau of Investigation

On September 23, 2016, Joey was debriefed by FBI agents and federal prosecutors in preparation for the Roof trial. A synopsis of this interview reveals that Joey was extensively questioned about himself and Roof starting from early childhood and continuing until the present day. Counsel's notes from this interview and the FBI's Memorandum of this Interview are attached as **Exhibits E and F**. Following this debriefing, defense counsel, the Probation Office, Roof's attorneys, nor this Court were ever informed or notified that the Government believed that Joey was in breach of his Plea Agreement.

### B.       Joseph Meek's Interview With the Government's Expert Forensic Psychiatrist

On October 13, 2016, approximately three weeks after Joey's debriefing with the Government, undersigned defense counsel was contacted by the Government and was asked to allow Joey to be interviewed by the Government's mental health expert. (*See* Attached **Exhibit G** – Email dated October 13, 2016).[2] This psychiatrist was evaluating the most critical issues for the Government and this Court – i.e Roof's competency to stand trial, his competency to represent himself and his overall state of mental health. As this Court well knows, guilt was not an issue in the Roof trial. Roof's mental status was arguably the key issue—whether he was competent to stand trial, whether he was competent to represent himself and his mental health status at the time he committed these heinous crimes. The government took the position

---

[2] It stands to reason that if the Government had any concerns about Joey's compliance with the terms of his Plea Agreement – his truthfulness, his candor, his full cooperation or his credibility – that they would not have asked him to meet with their expert witness, particularly regarding the most critical issues in the Roof trial.

throughout the trial that Roof was competent to stand trial, that he had the ability to represent himself, and that he was not mentally ill.

Accordingly, at the request of the Government on October 27, 2016, defense counsel, a paralegal and Joey drove to Charleston, South Carolina where he submitted to a lengthy interview by the Government's mental health expert, a forensic psychiatrist. Joey answered each and every one of the psychiatrist's questions without any hesitation. The extensive notes from this interview are attached as **Exhibit H.** At no time during this interview did the forensic psychiatrist indicate that the Government had informed him that Joey had in any way breached his plea agreement.

Following the interview by the forensic psychiatrist, defense counsel was not contacted by the Government for any further requests for interviews or information. Although defense counsel made clear that Joey stood ready, willing and able to testify in the Roof trial, Government attorneys indicated in early December that they did not know whether they would need to call Joey as a witness.

On December 7, 2016, defense counsel received a subpoena from Roof's attorneys for Meek to testify in the Roof trial. On December 7th and 8th 2016, defense counsel immediately informed the Government of this fact and made it abundantly clear that Joey intended to be in full compliance with his Plea Agreement and cooperate with the Government however necessary. *See* Attached **Exhibit I** – Emails dated December 7, 2016 and December 8, 2016. The undersigned defense counsel orally discussed with the Government the topics upon which Joey may be questioned upon based upon discussion with Roof's counsel. The Government then

13

indicated that should Joey be called as a witness, we would meet to prepare for any cross examination that they might want to do.

As this Court is aware, neither the defense nor the Government called Joey as a witness during the Roof trial. Roof did not contest his guilt or the fact that he alone planned and executed these horrific crimes. In light of this, the Government may have felt that Joey's testimony was unnecessary or duplicative. A skeptic may interpret the Government's decision as an intentional decision to deprive Joey credit for testifying and earning a downward departure for that testimony. Having presided over the Roof trial, this Court is best equipped to interpret the actions of the Government. Regardless, even though Joey was ready, willing, and able to truthfully testify and had done everything in his power to be in compliance with his Plea Agreement and cooperate – he was not called as a witness.

As this Court is aware, the Government <u>routinely</u> moves for a downward departure pursuant to USSG 5K1.1 in cases with far less cooperation than that rendered by Joey in this case. Even though Joey did not have the opportunity to testify in Roof's case, he provided substantial assistance to the Government and to this Court.

Despite all of these facts, the Government has now moved for an upward variance with no adequate explanation. The motion cites to the same operative facts that have been known to the Government since the inception of this case. In all of the undersigned defense counsel's twenty years (23) years of experience in litigating federal criminal cases – fifteen (15) of which were spent prosecuting federal cases for the federal government,  the undersigned is unaware of any situation in which the Government has taken a similar position. Indeed, the Government entered into a plea agreement with cooperation provisions. Joey did, in fact, fully cooperate. The

Government <u>never claimed</u> that Joey was in breach of his Plea Agreement and the Government subsequently moved for an upward variance three days prior to sentencing with no real explanation or basis.

## VI.    AN UPWARD VARIANCE IS NOT JUSTIFIED BASED UPON APPLICATION OF THE § 3553(A) FACTORS.

The Government has not provided this Court with absolutely any basis for the Court to vary upward from the Sentencing Guidelines. In fact, the Government's action in filing the motion three days prior to the scheduled sentencing hearing is puzzling and has yet to be adequately explained.

The defense has filed a lengthy Sentencing Memorandum and Motion for a Variance which discusses the application of the factors under 3553(a) and refers the Court to all of the arguments made in this motion. In sum, Joey has a ninth grade education and has suffered from mental health issues since a young age. Joey failed to appreciate that Roof was actually going to carry out the extreme crimes he described while they were both under the influence of cocaine and alcohol approximately a week before the murders. This crime which shocked the world was equally unimaginable to the 21 year old Meek who knew Roof made the statements in a drunken state.

The defense, pursuant to the decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), requests this Court to impose a sentence that is "sufficient but not greater than necessary to comply with" the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2). 18 U.S.C. § 3553(a). Those goals, the consideration of the "nature and circumstances of Mr. Meek's offense, " §

15

3553(a), and the other factors set forth in the statute compel a sentence of less than the 27-33 months called for by the United States Sentencing Guidelines and they certainly do not warrant an upward variance.

## VII.     CONCLUSION

For the reasons set forth above, the defense respectfully requests that this Court deny the Government's motion for an upward variance for all of the reasons set forth above. Given the unique circumstances of this case and Joey's background, a lower sentence will, in the broad sense, "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B). Joey's efforts at rehabilitation and cooperation with law enforcement demonstrate that the likelihood of recidivism is low and that a long period of incarceration is not necessary "to protect the public from further crimes of the defendant."  § 3553(a)(2)(C). Indeed, a sentence less than the 27-33 months recommended by the advisory guidelines would be "sufficient, but not greater than necessary," to comply with the goals of sentencing. 18 U.S.C. § 3553(a).

Respectfully Submitted,

S/Deborah B. Barbier
Deborah B. Barbier (#6639)
Deborah B. Barbier, LLC
1811 Pickens Street
Columbia, SC 29201
(803) 445-1032
dbb@deborahbarbier.com

March 10, 2017

Columbia, SC